In the Matter of PACIFIC FAR EAST
LINE, INC., Debtor.

Joseph M. ALIOTO, Plaintiff-Appellee,

v.

OFFICIAL CREDITOR COMMITTEE,
Defendant-Appellant.

No. 78–3633.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 1980.

Decided Aug. 28, 1981.

Vernon D. Stokes, San Francisco, Cal., for defendant-appellant.

Joseph M. Alioto, San Francisco, Cal., pro se.

Before KILKENNY and KENNEDY, Circuit Judges, and GRAY,* District Judge.

KENNEDY, Circuit Judge:

■ This case presents certain questions regarding the force and effect of an attorneys' contingency fee contract when there is an intervening arrangement under Chapter XI of the Bankruptcy Act of 1898.[1] The bankruptcy court awarded attorneys' fees to the appellee, Joseph M. Alioto, for services rendered to Pacific Far East Line, Inc. [PFEL]. PFEL was the debtor in possession in the arrangement proceeding. Alioto rendered most of his services prior to the arrangement pursuant to a contingent fee contract. PFEL's Official Creditors' Committee [OCC] brings this appeal.[2]

The OCC does not here contest the reasonableness of the award, which was $1,500,000. It does contend, however, that the amount awarded to the attorneys for services performed before the arrangement, constituting 95 percent of the fee, should be treated as a general creditor's claim, thus subject to the pro rata reduction applicable

---

* Honorable William P. Gray, United States District Judge for the Central District of California, sitting by designation.

1. Act of July 1, 1898, ch. 541, §§ 301–399, 30 Stat. 544 (1898), *as amended by* Act of June 22, 1938, ch. 575, 52 Stat. 883 (1938). Since the operative events occurred before the effective date of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (1978) (codified at 11 U.S.C. §§ 101–1330 (Supp. III, 1979)), the provisions of the 1898 Act control, *id.* § 403, and all further references in this opinion will be to the repealed 1898 Act.

2. Although Alioto has not cross-appealed, he has challenged this court's jurisdiction to hear the appeal. The district court's memorandum, from which the OCC appealed, was filed on October 16, 1978. That memorandum concluded with the following language:

In affirming the award of the referee, the court cautions that the effect of this decision depends upon the result reached in the pending appeals from the referee's order approving the Northrop settlement, which appeals have yet to be heard and determined.

Alioto argues that this language indicates a disposition contingent on the other appeals, and thus the memorandum was not a final judgment within the meaning of 28 U.S.C. § 1291 (1976). Although the district court affirmed the Northrop settlement on December 12, 1978, and entered an order affirming its published memorandum in the fee dispute six

days later, Alioto argues that such subsequent action cannot cure a prematurely filed notice of appeal. We disagree. The order finally affirming the bankruptcy court's judgment left nothing to be decided in the district court. It finally determined Alioto's rights in any fund generated by his efforts. The district court's subsequent action only confirmed the fact that there would be a fund to fight over. In such cases, we have not hesitated to accept a premature appeal. *Anderson v. Allstate Ins. Co.*, 630 F.2d 677 (9th Cir. 1980); *Ruby v. Secretary of the Navy*, 365 F.2d 385 (9th Cir. 1966) (en banc), *cert. denied*, 386 U.S. 1011, 87 S.Ct. 1358, 18 L.Ed.2d 442 (1967). Further, to dispose of this appeal on such technical grounds, when no danger of piecemeal appeals is present, would represent a retreat from this Circuit's "practical rather than ... technical construction [of] the finality rule." *Anderson, supra*, at 681.

In addition, Alioto claims that, since the district court's memorandum did not conform to Fed.R.Civ.P. 58's requirement that the judgment be set forth on a separate sheet of paper, OCC's notice of appeal is invalid. In *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), however, the Court decided that Rule 58's requirement was not jurisdictional. Consequently, in light of our discussion above regarding the practical construction of final orders, we believe that we should exercise our discretion to hear this appeal on the merits.

to all other unsecured claims. The appellee contends, on the other hand, that the district court was correct in finding that the attorneys had a lien on the funds generated by the settlement and that their fee was payable directly from the settlement fund in discharge of this lien. We agree with this position and affirm the judgment of the district court. Our ruling on this and related points is more fully explained below.

In 1974, PFEL had a substantial and complex claim against Northrop, Inc., for breach of warranty in connection with a contract for the manufacture and purchase of fiberglass barges. Financial considerations caused PFEL to substitute Alioto for the attorneys who had originally filed the suit. The original attorneys charged on an hourly basis, and PFEL determined it could not afford to prosecute the suit in that manner. Alioto, on the other hand, agreed to handle the case for a contingent fee. A written contingency contract was executed, and Alioto and his firm spent over three years attempting to resolve the case. The matter presented questions of antitrust law, Alioto's field of expertise, as well as intricate questions of contract law and admiralty jurisdiction.

In February of 1978, while the case was on appeal to this court, Northrop agreed to settle. The factual background and terms of the settlement are recounted in detail in the district court's published opinion. *In re Pacific Far East Line, Inc.*, 458 F.Supp. 771, 773–75 (N.D.Cal.1978). In brief, the terms of the settlement were as follows: Northrop agreed to pay $10 million in damages, lend PFEL another $7.5 million, and drop $99 million in counterclaims. In addition, as a result of the agreement, the Federal Maritime Administration released a $1.9 million bond held against PFEL's assets along with $3 million worth of liens held on two PFEL ships.

Alioto's original contract provided that he would receive a "contingent fee of 15 percent of the value of anything recovered by settlement . . . ." PFEL, however, had filed a Chapter XI petition in January, 1978, and the bankruptcy court appointed Alioto special counsel in April the same year, as required by Bankruptcy Rules 215 and 11–22.[3] By this time, Northrup already had indicated its willingness to come to an agreement. Constrained by this Circuit's rule prohibiting contingent fee contracts for special counsel, *Official Creditors' Comm. of Fox Markets v. Ely*, 337 F.2d 461, 468 (9th Cir. 1964), the bankruptcy court provided that Alioto would be paid "a general retainer."

On conclusion of the settlement, Alioto submitted his request for a fee of $1,875,000. The amount was his estimate of the value of 15 percent of the settlement. Pursuant to his office's standard practice in contingent fee cases, no time records were kept during the three years preceding the settlement. The bankruptcy judge ruled that Alioto's estimate of the fee would not be taken at face value and that he would have to make an estimate of the time spent on the case. In response, Alioto submitted an affidavit indicating he had spent over 4,700 hours on the case, approximately 95 percent of which was allocable to the period before PFEL's Chapter XI petition. The bankruptcy judge held that Alioto's original contingent fee agreement of 15 percent represented reasonable compensation for Alioto's services if limited to the actual damages paid by Northrop and not to the value PFEL obtained from release of liens and other non-monetary considerations. The bankruptcy court awarded Alioto $1,500,000, payable immediately from the settlement funds.[4] The Chapter XI arrangement has since failed and PFEL has been adjudicated a conventional bankrupt.

---

**3.** Bankruptcy Rule 11–22, applicable to Chapter XI arrangements, incorporates Bankruptcy Rule 215(a)'s provision which states that "[n]o attorney . . . shall be employed except upon order of the court."

**4.** At the time of the bankruptcy judge's order, $340,000 of the settlement had yet to be paid. The court ordered payment of this amount into the district court's registry, instead of to Alioto. Alioto thus received only $1,160,000. The $340,000 still remains in the district court's registry pending the disposition of this appeal.

The OCC argued below, and continues to argue here, that Alioto's claim, insofar as it seeks compensation for pre-petition services, is nothing more than an unsecured contract claim.[5] *See, e. g., Klein v. Rancho Montana De Oro, Inc.,* 263 F.2d 764, 769–70 (9th Cir. 1959). As such, it contends Alioto should have been required to submit the claim to the court for payment, and pro rata reduction, along with all other unsecured claims. With respect to the portion of Alioto's claim pertaining to services rendered during the arrangement, the OCC argues that this claim is for a simple expense of administration, payable without any priority over other administrative expenses.

In order to weigh these assertions, we start with the proposition that upon the filing of a Chapter XI petition, "[a] new entity is created with its own rights and duties, subject to the supervision of the bankruptcy court." *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.,* 519 F.2d 698, 704 (2d Cir. 1975). *See also Local Joint Exec. Bd. v. Hotel Circle, Inc.,* 613 F.2d 210, 213 (9th Cir. 1980); *In re E. C. Ernst, Inc.,* 4 B. R. 317, 319 (Bkrtcy.S.D.N.Y.1980). Thus, the filing of the petition on January 31, 1978, altered the contractual status between Alioto and PFEL. Specifically, within 60 days of the petition, Alioto was discharged by the failure of the new debtor in possession to assume the contingent fee contract. *In re E. C. Ernst, Inc.,* 4 B. R. at 319; *In re Miller,* 17 Collier's Bankruptcy Cases 28 (E.D.Pa.1978); *see also* 11 U.S.C. § 110(a)(6) (1976); Bankruptcy Rule 607.

That Alioto was discharged by operation of law does not mean, however, that he takes nothing under the original contract. Under California law, which governs the nature and status of claims against the debtor here, *see* 4A Collier's on Bankruptcy ¶ 70.04, at 60–62 n.31 (14th ed. 1978), an attorney retained under a contingent fee contract, and later discharged by the client without cause, holds a claim against the client for the reasonable value of his services. *Fracasse v. Brent,* 6 Cal.3d 784, 790–91, 100 Cal.Rptr. 385, 494 P.2d 9 (1972); *Weiss v. Marcus,* 51 Cal.App.3d 590, 598, 124 Cal.Rptr. 297 (1975). *See also Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d 866, 871 (9th Cir. 1979), *cert. denied,* 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1980). When Alioto was discharged by operation of the bankruptcy laws, he retained a claim, under state law, against PFEL in the amount of the reasonable value of his services.

If Alioto possessed a claim for the reasonable value of his services, without more, his claim would be unsecured and subject to pro rata reduction with payment after, not before, administrative expenses. *In re Owl Drug Co.,* 16 F.Supp. 139, 145–46 (D.C.Nev.1936), *aff'd sub nom. Cohn v. Edler,* 90 F.2d 823 (9th Cir. 1937); 4A Collier's on Bankruptcy ¶ 62.31[2] (14th ed. 1978). Alioto meets this problem by contending he has a valid lien on the settlement proceeds. We now turn to that aspect of the case.

California does not recognize the common law attorneys' charging lien,[6] and this court has noted that fact. *Desser, Rau & Hoffman v. Goggin,* 240 F.2d 84 (9th Cir.

---

5. Alioto argues that, under the original contract, he was not entitled to anything as compensation unless and until he was successful. He argues that he had no claim for pre-petition services since he was not entitled to any compensation during that period. *Cf. In re Coleman,* 87 F.2d 753 (2d Cir. 1937) (attorney's charging lien does not pass through bankruptcy if not reduced to settlement or judgment at time of bankruptcy.) He concludes by stating that since he had no right to be paid until the settlement was completed, his whole fee was earned during the Chapter XI arrangement and that it is not a pre-petition claim. This argument is fully answered by our textual discussion of Alioto's termination by operation of law.

6. At common law, an attorney retained on a contingent fee has a lien in the amount of his fees against any fund generated due to his efforts. *In re E. C. Ernst, Inc.,* 4 B. R. 317, 319–20 (Bkrtcy.S.D.N.Y.1980); Thompson, *Attorneys' Fees and Liens,* 85 Com.L.J. 136, 140–41 (1980).

1957). Instead, California attorneys may look to the funds generated by their efforts to collect their fees only as directed by the California Supreme Court. In *Isrin v. Superior Court*, 63 Cal.2d 153, 45 Cal.Rptr. 320, 403 P.2d 728 (1965), decided after *Desser, Rau & Hoffman*, the California Supreme Court held that the intent of the parties determines the type of claim an attorney may assert against any fund generated due to his efforts. 63 Cal.2d at 158–59, 45 Cal. Rptr. 320, 403 P.2d 728. In essence, *Isrin* holds that if the parties intend that the attorney look directly to the settlement for payment, then a lien against that settlement is created in the attorney's favor. *Id.; Gelfand, Greer, Popko & Miller v. Shivener*, 30 Cal.App.3d 364, 371, 105 Cal.Rptr. 445 (1973); *Skelly v. Richman*, 10 Cal.App.3d 844, 865, 89 Cal.Rptr. 556 (1970); *Wagner v. Sariotti*, 56 Cal.App.2d 693, 697, 133 P.2d 430 (1943).

■ The district court found that under the contingent fee contract, Alioto was "entitled to look to the judgment for his compensation" and thus was "entitled to an equitable line [*sic*]." 458 F.Supp. at 775. These statements necessarily include a finding of the requisite intent and are consonant with apposite California precedent holding the use of the term "lien" unnecessary to the creation of a valid attorney's lien.[7] See *Isrin*, 63 Cal.2d at 158–59, 45 Cal.Rptr. 320, 403 P.2d 728; *Skelly*, 10 Cal. App.3d at 865, 89 Cal.Rptr. 556; *Bartlett v. Pacific Nat'l Bank*, 110 Cal.App.2d 683, 689, 244 P.2d 91 (1952); *Wagner*, 56 Cal.App.2d at 697, 133 P.2d 430. The evidence also supports this finding. The very reason for hiring Alioto and terminating the first set of attorneys was the inability of PFEL to pay fees except from a fund generated by the litigation. This supports the lower court's determination that, even after discharge, Alioto held a lien on the PFEL's settlement for the reasonable value of his services rendered prior to the Chapter XI petition. *Siciliano v. Fireman's Fund Ins. Co.*, 62 Cal.App.3d 745, 752, 133 Cal.Rptr. 376 (1976). *Cf. In re Prudence Co., Inc.*, 96 F.2d 157 (2d Cir.) (attorney's charging lien survives bankruptcy and hence counsel retained prior to bankruptcy on contingent fee received full amount of fee even when case concluded after bankruptcy), *cert. denied*, 305 U.S. 616, 59 S.Ct. 75, 83 L.Ed. 393 (1938).

■ The OCC nevertheless asserts that any lien became effective only as of the date of payment, rather than the date of creation. If true, this would eviscerate the lien and render Alioto's claim nothing more than an expense of administration, for under this theory the settlement was earned and paid during the Chapter XI arrangement. California law, however, is to the contrary. Under California law, the lien takes effect from the date it was created; upon the fund's production, the lien attaches to the specific asset. *Haupt v. Charlie's Kosher Market*, 17 Cal.2d 843, 845–46, 112 P.2d 627 (1941); *Gelfand, Greer, Popko & Miller*, 30 Cal.App.3d at 376, 105 Cal.Rptr. 445; *Del Conte Masonry Co., Inc. v. Lewis*, 16 Cal.App.3d 678, 680–81, 94 Cal.Rptr. 439 (1971). *See also Cetenko v. United Cal. Bank*, 114 Cal.App.3d 449, 455, 170 Cal.Rptr. 706, *hearing granted*, S.F. 24275 (Cal. Sup.Ct. March 4, 1981). Under this view,

---

7. The OCC, in its reply brief, argues for the first time that since both the bankruptcy and district courts did not make explicit findings on the intent issue, we are barred from considering it, and thus we also are barred from finding a lien. Although we are not obliged to consider arguments raised for the first time in a reply brief, *Levy v. Urbach*, 651 F.2d 1278, 1280–81 n.3 (9th Cir. 1981), we note that the possible existence of a lien has been an issue since the dispute arose, if only in the sense that the OCC actually attempted to disprove its existence. Further, we note that both the 1974 fee agreement and the testimony surrounding its making were in the record and uncontested, thus providing a basis for affirmance even in the absence of explicit consideration by the court below. *See Colautti v. Franklin*, 439 U.S. 379, 397 n.16, 99 S.Ct. 675, 686 n.16, 58 L.Ed.2d 596 (1979); *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 452 (9th Cir. 1980). Finally, in a bankruptcy appeal, where the issue may properly be disposed of by examination of the record, we are justified in undertaking our own search for the necessary intent. *In re Clemens*, 472 F.2d 939, 943 n.5 (6th Cir. 1972). We believe, after such an examination of the record, that the district court's action was proper.

correctly followed by the court below, the lien takes effect from the date of creation in 1974 and thus has priority.

■ The final question presented is whether the courts below erred in setting the amount of the fee. Under the bankruptcy court's ancillary jurisdiction, it has the power to decide state law claims necessary to the resolution of the bankruptcy proceeding. *Sanders v. Providence Washington Ins. Co.*, 320 F.Supp. 1189 (E.D.Mo. 1970), *aff'd*, 442 F.2d 1317 (8th Cir. 1971). *See also In re Ace Sales Co.*, 357 F.Supp. 936, 941 (E.D.Mo.1973). Here, this jurisdiction included the authority to determine the validity and amount of Alioto's lien under California law. *n re Land Investors, Inc.*, 544 F.2d 925, 931–33 (7th Cir. 1976); 4B Collier's on Bankruptcy ¶ 70.87[2] (14th ed. 1978). As to the amount of the lien, both the bankruptcy and the district courts found that the $1,500,000 constituted a reasonable fee under federal bankruptcy standards. *In re Pacific Far East Line, Inc.*, 458 F.Supp. 771, 775–76 (N.D.Cal.1978).[8] But federal standards are not directly applicable; the lien was created by state law, and thus state law standards apply to its measure. *In re Diplomat Electric, Inc.*, 499 F.2d 342, 348–49 (5th Cir. 1974). Alioto has not cross-appealed, however, so we do not question the adequacy of the fee under California's standard of reasonableness. *Cf. Fracasse v. Brent*, 6 Cal.3d 784, 792, 100 Cal.Rptr. 385, 494 P.2d 9 (1975) (a significant factor is "the amount involved and the result obtained.")

■ With the existence and amount of a valid attorney's lien thus established, it was proper for the bankruptcy court to immediately award Alioto the portion of the fee which related to pre-petition services. *In re Land Investors, Inc.*, 544 F.2d 925, 928 (7th Cir. 1976); *In re S. T. Foods, Inc.*, 202 F.Supp. 37 (S.D.N.Y.1962); 3A Collier's on Bankruptcy ¶ 64.02[2], at 2065–69 (14th ed. 1975). As found by the bankruptcy court, 95 percent of Alioto's services were rendered prior to the Chapter XI arrangement, and thus 95 percent of the $1.5 million award, or $1,425,000, should have been set aside in satisfaction of Alioto's lien against the settlement proceeds and immediately awarded to Alioto. *Id.*

■ The OCC is correct, however, in its claim that, at the very least, the remaining 5 percent of the award is properly classified as an expense of administration.[9] The services rendered by Alioto during this period were for the benefit of the new debtor in possession and thus were subject to the April, 1978, general retainer agreement.[10]

The district court, however, set aside $340,000 of the award pending the outcome of this appeal. *See* note 4 *supra*. We reverse the district court's order awarding this amount to Alioto and order $265,000 disbursed to Alioto, which will constitute payment of the balance of his state law lien. The remaining $75,000, representing the fees for services performed during PFEL's arrangement, is to be held in the

---

**8.** The bankruptcy judge ended the hearing on Alioto's fees with this statement:

As I indicated before, I think the contingent fee agreement has not been recognized as such. It has been used as a guideline, but I think it is a reasonable guideline, and it also has the dual purpose, I think, of largely fulfilling the expectations of counsel with reference to what he might receive.

**9.** The OCC contends that since Alioto claims that the fee was wholly "earned" during the Chapter XI proceeding, *see* note 5 *supra*, the entire fee is an expense of administration and thus not subject to priority. *See, e. g., In re Columbia Ribbon Co.*, 117 F.2d 999, 1001 (3d Cir. 1941). We reject this argument for as much of the settlement as Alioto has a lien

against, but accept it for all fees earned after the filing of the Chapter XI petition.

**10.** Given that Alioto's contract was for compensation of professional services, the bankruptcy court could not have awarded any attorneys' fees without first approving the award in accordance with Bankruptcy Rules 219 and 11–31. Moreover, Alioto could not have been retained as special counsel without an appropriate court order. Bankruptcy Rules 215 and 11–22. Consequently, any fee relating to the post-arrangement period had to have been awarded pursuant to the April, 1978 general retainer and not from rights originating in the December, 1974 contract. Tne record amply supports that the bankruptcy court did just that. *See* note 8 *supra*.

court's registry pending computation of the value of Alioto's services rendered during the arrangement under the general economical spirit of the Bankruptcy Act of 1898. *York Int'l Bldg., Inc. v. Chaney,* 527 F.2d 1061 (9th Cir. 1975). After such computation, this fee should be distributed as any other expense of administration.

Affirmed in part, reversed in part, and remanded with instructions.